IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHELLE D. RICE,

        Plaintiff,

   V.                        No. 08-4132-SAC and
                                    No. 09-4133-SAC

STATE OF KANSAS,

        Defendant.

## MEMORANDUM AND ORDER

These consolidated Title VII cases come before the court on defendant's motion for summary judgment and plaintiff's motion for partial summary judgment. Plaintiff seeks summary judgment on her claim of hostile work environment sexual harassment, but not on her claim of retaliation.

**Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show entitlement to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied*, 506 U.S. 1013 (1992). In applying this standard, the court views the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Adler v. WalMart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Id.*, at 671. The non-movant must show more than some "metaphysical doubt"

based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587. *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

**Facts**

In March of 2007, plaintiff was hired by defendant as a Corrections Officer I. On April 2, 2008, plaintiff timely reported to work for her 2 p.m. shift, wearing her work uniform which consisted of pants, a shirt, boots, and belt. To plaintiff's surprise, she and other employees were required to pass through a newly installed and highly sensitive metal detector. Defendant's policy requiring employees to pass through the new metal detector was not supposed to be implemented until April 21st. Corrections Supervisor I Johnstone, and Corrections Officer II Thompson were working the metal detector at the time.

The first time plaintiff walked through the metal detector, it alerted. Plaintiff was told to remove the metal stays on her pants, her boots, and her belt, and did so. On her second try, plaintiff was scanned with a handheld detector, which alerted in her upper torso area. Plaintiff explained her belief that the underwire in her bra had caused the alert. After plaintiff's third unsuccessful try, Officer Johnstone notified Captain Mathias of

the facts and was told that plaintiff would have to remove her bra and walk to her post before replacing it.

Officer Johnstone was aware that the relevant order (TCF Post Order #24) said nothing about employees having to remove undergarments. Nor did that order provide for a strip search if an employee failed to clear the metal detector a third time. The most intrusive measure it allowed was a pat down, unless there was reasonable suspicion that the employee was in possession of contraband. When Officer Johnstone notified Captain Mathias of the facts and was told plaintiff would have to remove her bra and walk to her post before replacing it, he protested that requiring employees to remove undergarments was not in the written policy, but was told it was a direct order and to do as he was told. Officer Johnstone was disturbed by this order, and got express confirmation of it from his Lieutenant and then from his Captain, and reconfirmed it each time a woman failed to clear the metal detector. Each time he was told that they had to step through the metal detector without any alert, even if it meant they had to remove their undergarments and walk to their post before replacing them.

Officer Johnstone told plaintiff she would have to remove her bra, pass through the metal detector, and walk to her post braless. She became upset, felt humiliated, and started to cry. Three of plaintiff's superior officers came down from Captain Mathias's office and told plaintiff that if she did not remove her bra and walk to her post braless, she would not be permitted to work. Co-workers, volunteers, and inmates were present at the time, and plaintiff was visibly upset. Officer Short stated the incident made him feel as though he "had been forced to watch a rape," and he filed an internal EEO sexual harassment complaint because of the incident.

At some point, plaintiff went into the restroom where she removed her bra, placed it in a bucket, and replaced her shirt. The bucket was run through the scanner and was then returned to plaintiff. Plaintiff was crying and felt humiliated and wanted to go home, so called the Captain to see if she could do so. The Captain told her that if she left, her absence would be unauthorized. Plaintiff responded that she was ill and mentally overwrought by the incident, and could not face the inmates, at which point the Captain asked plaintiff to come to his office. It is disputed whether plaintiff went to the Captain's office before or after she removed her bra. Officer Johnstone testified that the plaintiff went to the captain's office before she removed her bra. Plaintiff testified that she went to the Captain's office after she removed her bra, while braless, but also testified that she went there wearing her bra.[1] When plaintiff told the Captain she wanted to go home to change into another bra, she was noticeably upset and choking on her words. He responded that if she went home instead of walking to her post braless, her absence would be considered unauthorized and she could face disciplinary action including termination.

Plaintiff was told that it was necessary for her to keep her bra off until she got to her post because if she put it back on in the closest restroom, she "would have to go through the metal detector again" and it "would set off again." *Id*, p. 41. Defendant believed that there was no suitable place between the area of the metal detector and

---

[1]Plaintiff also testified, however, that she went to the captain's office because she was debating going home to get a bra without wire "so she wouldn't have to remove" it. Rice depo. p. 38. Plaintiff subsequently testified that they told her she "would have to take off my bra – or – my bra was already off. They said I would have to leave my bra off until I got to my post. *Id.*, p. 40.

the plaintiff's duty station for plaintiff to use to replace her bra. Afraid of losing her job, plaintiff eventually walked crying and braless to her post , then went into a restroom and replaced her bra. Because it was time for shift change, there was lots of foot "traffic," so an unspecified number employees and inmates witnessed plaintiff walking from the SAC building where the metal detector was, to the captain's office, then to her post. Plaintiff later sought counseling because of this metal detector incident.

That day, plaintiff overheard lots of inmates and employees talking about the incident. Plaintiff does not recall their names, and does not recall what they said because she just heard "little bits and pieces" of the conversations. The next day, plaintiff heard a female officer ask a male, Officer Hester, what he thought of the incident, and he replied: "I kind of liked it. I just wish I could pick and choose who I wanted to remove their bras." Rice depo., p. 49-50. Plaintiff believes that for days afterwards, people in the whole facility were talking about the incident. Plaintiff complained to Captain Garvin about Officer Hester's comment, and he told her to write it down so he could discipline the employees. She did not do so because she didn't want to single out only those two individuals.

On April 2nd or 3rd, plaintiff met with Deb Mayo, an EEO officer for defendant, who told plaintiff to fill out a grievance form. Plaintiff did so soon thereafter. On April 4th, Deputy Warden Cummings met with plaintiff and verbally apologized to her regarding the metal detector incident. He also met with her on April 11, 2008, and assured her that permanent changes were being made to the new screening procedures. On April 14th, Deputy Warden Cummings, in his written response to plaintiff's grievance, concluded:

Security personnel that were conducting the metal detector screening on

5

April 2, 2008 appear to have followed the procedures set out in IMPP 12-121 and post order # 24, except that the opportunity to remove the article of clothing, as an alternative to a strip search, was given.

When it was discovered that the procedure resulted in the negative outcome experienced by Ms. Rice, action was taken to change the procedure.

The published version of IMPP 12-121 reflects that the effective date is April 21, 2008. Accordingly, [defendant] was not required to fully enforce the policy until that date. We agree that the policy should not have been enforced until that date.

Likewise we agree that it is not appropriate

There is no evidence that there was any intent to humiliate or harass any employee. It appears that the intent of staff was to carry out the provisions of IMPP 12-121.

Dk. 98-4, p. 11. The grievance response notes the "action taken" was: "Post Order # 24 will be modified to the extent that a pat search done by a same gender employee in a private place may be used to verify that an undergarment is the cause of a metal detector alert, and that contraband is not present ..." *Id.* The Post Order was changed effective May 7, 2008, and it additionally added that "[a]t no time shall any Employee or Volunteer be required to remove any undergarment." Dk. 90, Exh. 4.

Plaintiff filed a claim of sexual harassment with the EEOC and the Kansas Human Rights Commission on July 20, 2008. She later received a right to sue letter from the EEOC.

In October of 2008, plaintiff broke her leg in a non-work related accident and began FMLA leave from work on or about October 22, 2008. When plaintiff's FMLA leave expired near the end of January, she went on leave without pay (LWOP) status until sometime in March of 2009 when she returned to work.

After plaintiff returned to work, she and other COIs were asked to apply for a promotion to a Corrections Officer II position, as was standard procedure. Plaintiff was promoted on May 1, 2009 and, pursuant to policy, was placed on probationary status.

On July 29, 2009, plaintiff received an "unsatisfactory" performance appraisal which she appealed. The Appeal Board upheld the appraisal rating and recommended plaintiff's demotion back to COI. Warden Koerner demoted plaintiff to that classification on August 13, 2009. Plaintiff remained employed until April of 2010. Other uncontested facts will be included as relevant, below.

## I. Exhaustion

Defendant first contends that plaintiff has failed to exhaust her administrative remedies because she did not obtain the a right to sue letter from the Attorney General. The relevant statute states that if the EEOC dismisses a charge in a case involving a government, governmental agency, or political subdivision, the Attorney General shall issue the right to sue letter. 42 U.S.C.A. § 2000e-5. Defendant contends that because plaintiff has sued the State of Kansas, this statute requires a right to sue letter from the Attorney General. Plaintiff tacitly concedes that she made no effort to get a right to sue letter from the Attorney General, but claims such a request would have been futile, and that her right to sue letter from the EEOC should suffice. The Court agrees.

The Tenth Circuit has interpreted the statutory language quoted above to require plaintiffs to obtain a right to sue letter from the Attorney General, rather than from the EEOC, in all cases involving a governmental respondent. *See Hiller v. Oklahoma ex rel. Used Motor and Parts Com'n*, 327 F.3d 1247, 1251-1252 (10th Cir. 2003); *Thames v. Oklahoma Historical Soc'y,* 646 F.Supp.13, 16 (W.D.Okla. 1985), *aff'd per curiam*, 809 F.2d 699 (10th Cir. 1987). The requirement is not jurisdictional, but is instead a condition precedent to suit. *Hiller*, 327 F.3d at 1251-51. Accordingly, because plaintiff does not have a letter from the Attorney General, she has not complied with the statute.

Nontheless, equitable considerations may permit a plaintiff to go forward. A Title VII plaintiff who cannot satisfy the exhaustion requirement may avoid dismissal by establishing one of the available equitable doctrines. *Townsend v. State of Okl. ex rel. Oklahoma Military Dept.*,760 F.Supp. 884, 886 (W.D.Okla. 1991), approved in *Hiller*. In *Townsend*, the Court found this particular requirement to be subject to the equitable doctrines of waiver, estoppel, or modification, and waived the requirement because the Attorney General refused to issue the letter despite the plaintiff's diligent attempt to comply with the statute. Here, in contrast, plaintiff has apparently made no effort to comply with the statute.

Nonetheless, the court believes such act would have been a futile gesture, which the law does not require. The Attorney General has a work-share agreement with the EEOC, codified at 29 C.F.R. § 1601.28(d), which shifts the duty to the EEOC to issue letters in cases such as this, where "there has been a dismissal of a charge." *Stewart v. Oklahoma*, 292 F.3d 1257, 1258 -1259 (10th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003). The regulation states: "In all cases where the respondent is a government, governmental agency, or a political subdivision, the Commission will issue the notice of right to sue when there has been a dismissal of a charge." 29 C.F.R. § 1601.28(d). Plaintiff is therefore in a Catch-22 situation: "The statute requires her to get a letter from the Attorney General, but the regulations prevent her from getting that letter. " *Lugo v. City of Charlotte*, 577 F.Supp. 988, 990 (W.D.N.C. 1984).

The Tenth Circuit has made clear that requesting such letters is futile, because such requests are routinely denied.

... the situation created by the catch-22 between the statute and the

8

regulations is "obviously unfair." *Fouche,* 713 F.2d at 1526. [Plaintiff] would have no way to pursue her complaint if an equitable accommodation were not granted, given that the Attorney General deems the right to sue notice from the EEOC to be sufficient to meet the Attorney General's duties under the statute. Although [plaintiff] has at this point received a refusal from the Attorney General, we agree with the other courts that have noted the futility of requesting such letters when the requests are routinely denied. *See, e.g., Townsend*, 760 F.Supp. at 887-88. As we observed in *Martinez*, "if a plaintiff ... has in some extraordinary way been prevented from asserting his or her rights, we will permit tolling of the limitations period." *Martinez*, 738 F.2d at 1110 (quotation omitted). The interests of justice require that we provide equitable relief in such a situation, in order to preserve for plaintiff an avenue by which to pursue her complaint. *Cf. Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 429, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965) (indicating "interests of justice require vindication of the plaintiff's rights" where plaintiff "has been prevented from asserting them"). We therefore conclude that the district court's refusal to grant equitable relief constituted an abuse of discretion.

*Hiller*, 327 F.3d at 1252 (reversing district court's grant of summary judgment to defendant based on lack of right to sue letter from attorney general.)

 Here, as in *Hiller*, it would work an injustice "to deprive [plaintiff] of a remedy for failure to meet a nonjurisdictional requirement that is beyond her control." *Hiller*, 327 F.3d at 1252. Defendant's motion for summary judgment on this basis is therefore denied.

## II. Sexual harassment - hostile work environment

To establish a claim of sexual harassment, plaintiff must prove that she was harassed on account of her sex and that the harassment was pervasive or severe enough that it affected a term, condition, or privilege of her employment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied*, 516 U.S. 826 (1995).[2]

---

[2]Because the defendant concedes that its acts were "because of . . . sex," Dk. 99, p. 13, the Court does not address this requirement. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring) ("The critical issue, Title VII's text

The court first assesses whether a reasonable jury could conclude, based on the evidence of record, that "[plaintiff's] workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Herrera v. Lufkin Industries., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (internal quotation marks omitted). "Pervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim. *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998), *cert. denied*, 525 U.S. 881 (1998). Nevertheless, those two grounds "are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once ..., while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008), quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002).

The Court finds that the metal detector incident was not pervasive because it was a one time event. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, n. 11 (1998) (finding incidents of environmental sexual harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.")

Defendant additionally contends that the incident was not severe because no physical touching occurred. The Court declines to adopt this limitation, finding instead that it must consider the totality of the circumstances, as the Tenth Circuit has instructed:

_____

indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.")

> "In making this determination, we consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." *Herrera*, 474 F.3d at 680 (internal quotation marks and alterations omitted). We may consider the conduct's frequency and severity; "whether it is physically threatening or humiliating, or a mere offensive utterance"; and whether it unreasonably interferes with the plaintiff employee's work performance. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007).

*Tademy*, 614 F.3d at 1144. Although "no single factor is required," *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998), an isolated incident, unless extremely serious, will not amount to discriminatory changes in the terms of employment. *Faragher*, 524 U.S. at 788.

The Court finds that the incidents alleged by the plaintiff, even viewed together in the light most favorable to her, are not sufficiently severe or pervasive as to raise a material question of fact as to sexual harassment.

First, defendant's purpose was not to discriminate against the plaintiff or any female based on sex. The new security requirement to pass through the metal detector was imposed on all corrections officers, regardless of their gender. It did not have a disparate impact on all females, but on the plaintiff because of the structure of the bra she was wearing at the time. Plaintiff has not shown that the conduct's disproportionate impact on women is great, or that many other women were negatively affected by the new security procedure, thus no group-based effect has been shown. Additionally, although plaintiff was required to walk to her post braless, no facts suggest that this was because of intentional gender animus or sexual desire. Instead, the record shows this was only because superior officers determined, rightly or wrongly, that her doing so was necessary for security reasons, and believed that there was no place for plaintiff to

11

change her clothes until she reached her duty station. None of the facts that would tend to show gender animus or ill will have been established.

Nor was the effect of the incident on plaintiff physically threatening. Although the incident was humiliating, the facts fail to establish that the degree of humiliation suffered by the plaintiff was due solely to defendant's acts. Neither party has informed the Court how far the Captain's office was from plaintiff's post or from the metal detector, or whether it was even apparent to inmates or others on plaintiff's walk to her post that she was braless. Plaintiff speculates that the incident could cause her to lose the respect of inmates, but no facts have been established that show any knowledge of the incident or of her bralessness by inmates at her post, or any loss of respect, or any other impact of this incident on plaintiff's workplace.

Additionally, it is significant that the plaintiff works in a correctional facility and that the incident involved security devices and procedures. "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Just as the Court's role is not to remedy bad employment decisions or to sit as a super-personnel department, *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010), the Court does not presume to sit as an expert in matters of security in correctional facilities. Courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547.

"[F]ederal courts ought to afford appropriate deference and flexibility to state

officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). "Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life." *Id.* ... Correctional officials are professional experts in matters of security and discipline; as such they are better suited to make decisions about security and discipline than are the courts. *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

*Altman v. McKee*, 2009 WL 891707, 8 (W.D.Mich. 2009). Defendant's policy and the supervisor's decision to deviate from it were motivated by security concerns, not by sexual interest or sexual animus.

Further, the incident occurred on the first day of a new security procedure which was implemented 19 days prematurely, so neither the employees walking through the metal detector nor the officers administering the security procedure were thoroughly familiar with administering it. The outcome experienced by the plaintiff was obviously not foreseen by defendant, because: 1) when the incident occurred, the officer doing the screening had to call his Captain for directions on how to proceed; and, 2) soon after defendant learned that the procedure resulted in the negative outcome experienced by the plaintiff, defendant changed the procedure to avoid its recurrence. The metal detector incident, although perhaps the result of defendant's negligence, does not evidence intentional harassment. This lessens the severity of the acts.

Additionally, Deputy Warden Cummings met with plaintiff two days after the incident, even before plaintiff filed a grievance about it, and verbally apologized to her. His apology is echoed in his later response to plaintiff's grievance, in which he agreed that the policy should not have been enforced until a later date, and "it is not

appropriate".[3]  Swift apologies and admissions abate, at least somewhat, the severity of the incident. *See Witt*, 136 F.3d at 1433.

The Court also considers the co-employees' comments after the metal detector incident, but plaintiff's allegations of their gossip are vague and conclusory, without reference to specific dates, circumstances, persons, or statements. Plaintiff does not allege that the comments were directed to her or that the speakers knew she was within earshot. That the comments were only inadvertently overheard by plaintiff "indicates a lower degree of animosity and severity than is present in the typical case, in which a harassing supervisor deliberately inflicts the harassment on the victim." *Witt*, 136 F.3d at 1433. Plaintiff complains only that others related the facts about the metal detector incident, and does not show a steady barrage of opprobrious sexual or vulgar comments. Plaintiff's evidence of gossip is not sufficient to create a genuine issue of material fact as to sexual harassment. *See Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000).

Plaintiff specifies only one comment she overheard - a gender-related joke by Officer Hester in response to another officer's question.[4] This isolated comment is a far cry from the vulgar "gender-specific epithet" that usually supports sex-based claims of hostile work environment. Even a few incidents of gender animus do not establish a pervasively hostile work environment, *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790 (10th Cir.

---

[3]The context does not clarify what "it" is, and the sentence contains no period, as if the remainder of the sentence had been deleted. *See* Dk. 98-4, p. 11.

[4] Officer Hester, when asked what he thought of the incident, replied: "I kind of liked it. I just wish I could pick and choose who I wanted to remove their bras." Rice depo., p. 49-50.

2007), *citing Herrera*, 474 F.3d at 680; *Chapman v. Carmike Cinemas,* 307 Fed.Appx. 164, 171, 2009 WL 57504, 6 (10th Cir. 2009). Title VII is not a "general civility code" and"sporadic use of abusive language, gender-related jokes, and occasional teasing" are among "the ordinary tribulations of the workplace" (quotations omitted)). *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Nonetheless, when Captain Garvin learned about Officer Hester's comment, he took it seriously and told plaintiff to write it down so he could discipline the employees involved. Plaintiff chose not to do so and cannot now blame defendant for not having investigated or disciplined others.

The Court is sympathetic to the predicament plaintiff experienced, and believes that she was understandably humiliated by the incident. Nonetheless, the record fails to raise a material question of fact as to the severity or pervasiveness of sexual harassment. *See Witt*, 136 F.3d 1424; *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 170-71 (10th Cir.) (finding insufficient pervasiveness although harasser pinned the victim on a pool table), *cert. denied*, 519 U.S. 983 (1996); *Hayes v. Cosentino's Price Chopper Food Stores, Inc.*, 2004 WL 1004491, *12  (D.Kan. 2004) (citing cases of insufficient severity).

Accordingly, the Court finds it unnecessary to determine whether defendant could be found liable under Title VII, *see Tademy*, 614 F.3d at 1146 -1147 (discussing a negligence theory), or whether the Court should adopt the "*McCurdy* modification" to the *Ellerth/Faragher* affirmative defense to respondeat superior liability for one-time harassment by a supervisor, *see Chapman v. Carmike Cinemas*, 307 Fed.Appx. 164, 170, 2009 WL 57504, 5 (10th Cir. 2009).

**III. Retaliation**

Plaintiff additionally contends defendant violated Title VII by retaliating against her for alleging that defendant sexually harassed her.

> To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007) (quoting *Antonio*, 458 F.3d at 1181).

*Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1215 (10th Cir. 2010). If a plaintiff establishes a prima facie case, the defendant "has the burden of coming forth with a legitimate, nondiscriminatory reason for adverse action." *Butler v. City of Prairie Village*, Kan., 172 F.3d 736, 752 (10th Cir.1999). If the defendant meets that burden, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action." *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1265 (10th Cir. 2009).

Defendant does not dispute that plaintiff engaged in protected activity by complaining of sexual harassment to the EEOC on July 20, 2008. Instead, defendant contends that plaintiff has not shown adverse action in some cases, or a causal connection in any case.

**Adverse action**

An "adverse action" for purposes of a retaliation under Title VII of the Civil Rights Act of 1964, "is not limited to discriminatory actions that affect the terms and conditions of employment." *Reinhardt v. Albuquerque Public Schools Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010), *citing Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64

(2006). In determining whether an employee has suffered adverse action for purposes of retaliation under Title VII, the Court uses the objective standard of a "reasonable employee."

> ...Title VII protects individuals 'not from all retaliation' but only from retaliation 'that produces an injury or harm' " that itself rises to a " 'level of seriousness.' " *Id.* at 1087 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). To qualify under this standard, we held in *Williams* that a plaintiff must show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (*quoting White*, 548 U.S. at 68, 126 S.Ct. 2405) (internal quotation marks omitted). "Requiring this level of adversity ... is necessary 'to separate significant from trivial harms,' " *id.* (*quoting White*, 548 U.S. at 68, 126 S.Ct. 2405), "petty slights, minor annoyances, and simple lack of good manners," *White*, 548 U.S. at 68, 126 S.Ct. 2405. "Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

*Johnson*, 594 F.3d at 1216. In such cases, the Court construes the phrase "adverse employment action" liberally and does not limit it to "monetary losses in the form of wages or benefits." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) (quotation marks and citation omitted). In retaliation cases, "acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although " 'a mere inconvenience or an alteration of job responsibilities' will not suffice." *Id.* (citation omitted)." *Reinhardt v. Albuquerque Public Schools Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (applying ADA standard of retaliation).

Plaintiff alleges the following retaliatory adverse actions: unwarranted write ups, denial of light duty assignment, denial of benefits, denial of seniority rights, and

demotion. Dk 76, p. 6.[5]

**Unwarranted write ups**

Plaintiff contends that she was given unwarranted write ups in April, May and June of 2008, after she filed her internal grievance noting sexual harassment. It is well established use of the employer's internal grievance procedures constitutes protected activity under Title VII. *See Pastran v. K-Mart Corp.,* 210 F.3d 1201, 1205 (10th Cir. 2000). In support of this factual assertion, plaintiff cites only to her disciplinary file, Exh. 33. *See* Dk. 99, p. 37. The court has reviewed its entirety, and finds only one document bearing a 2008 date. This document shows that CS1 Sweatt spoke to plaintiff about time sheets on one occasion. A single write-up which fails to demonstrate any harm to one's future employment prospects is not an adverse employment action. *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1270 (10th Cir. 2005). The disciplinary file fails to raise a material question of fact that plaintiff was disciplined or otherwise subjected to adverse action during the months of April, May or June of 2008, as alleged.

**Denial of light duty assignment**

Plaintiff's doctor signed a form releasing her to light duty on February 5, 2009. This release was faxed to defendant, who did not receive it until March 4th. Plaintiff returned to work in March on a date not specified by the parties.

Defendant asserts that plaintiff never submitted the required application for a light duty assignment for her leg injury, so was never denied light duty, and thus did not

---

[5]Plaintiff's briefs discuss additional adverse actions, but the Court will not consider matters not included in the pretrial order. *See* Dk 76; Rule 16(e); *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276-77 (10th Cir. 2006).

suffer adverse action. It is uncontested that plaintiff had requested and received a light duty assignment in 2007, so she knew what the procedure was, and had access to defendant's required forms on the internet, but failed to submit them for her leg injury in 2008. Plaintiff contends that doing so would have been futile, and establishes that defendant's Human Resources Director, Mr. Harold, repeatedly and erroneously told her[6] that light duty was reserved for employees who, unlike plaintiff, had work-related injuries. Plaintiff cites the contrary testimony of Warden Koerner that light duty is available to any staff member "if there is a light duty post available." Dk.100, Exh. 21, p. 73. But plaintiff has failed to show that there was a light duty post available in February or March of 2009.

### Causal connection

Even assuming, *arguendo*, that plaintiff was improperly denied the opportunity for available light duty work in February of 2009, and that such act constitutes adverse action,[7] the six month time period between that date and the date of plaintiff's protected activity (her filing of her EEOC charge of sexual harassment on July 20, 2008) is too remote to demonstrate a causal connection between the two events, absent other

---

[6]The cited conversation occurred on March 24th, after plaintiff filed a grievance about not getting the February circulation of post rotation duty. Any misrepresentations made during that conversation would not be a basis for plaintiff's belief prior to that date that submitting the required form would be futile. Other documentation in October of 2008 reveals plaintiff's understanding that no light duty assignment was "available to [her] at this time..." but that "if light duty should become available, I will return to work when I am released to light duty." Dk. 99, Exh. 5.

[7]The denial of a transfer, even to light duty, constitutes a materially adverse action only if the employee presents some evidence beyond her subjective desire for the position. *Semsroth v. City of Wichita,* 555 F.3d 1182, 1186 (10th Cir. 2009).

factors. *See Myers v. LeFlore County Bd. of Com'rs,* 134 F.3d 383, 1998 WL 43170, 4, Table (10th Cir. 1998) ("... it is clear the gap of six to seven months between the occurrences is not sufficient to justify an inference of causation); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month time lag between participation in protected activity and termination not sufficient to justify inference of causation). A "causal connection" between a protected action and a subsequent adverse action can be shown through "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007) (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1218 (10th Cir. 2006) (internal quotation marks omitted). If the adverse employment action was not "very closely connected in time to the protected activity... the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (internal quotation marks omitted). Plaintiff does not suggest other causal factors, but instead generalizes that the "record shows a pattern of retaliation very close in time" to plaintiff's complaint. Dk. 99, p.42. The Court disagrees.

**Denial of benefits**

Plaintiff contends that she was denied benefits in retaliation for her sexual harassment complaint, but the only benefit specifically addressed in the record is plaintiff's health insurance benefits. It is undisputed that defendant continued to make these benefit contributions on behalf of the plaintiff throughout the time she was on FMLA leave, *i.e.*, until the end of January, 2009. Thereafter, plaintiff was not on FMLA

leave but was on leave without pay until she returned to work in March of 2009. Plaintiff admits that defendant told her that because of her LWOP status, she would be responsible for paying for her health insurance and defendant would no longer pay the employer's share.

The Court assumes, *arguendo*, that non-payment of plaintiff's health insurance contributions constitutes adverse action. Nonetheless, no causal connection is shown. Plaintiff's health insurance contributions were paid until at least through the end of January of 2009, six months after plaintiff filed her EEOC charge. Any change in benefits thereafter is too remote to demonstrate a causal connection between the two events, and no other causal connection is alleged.

### Denial of seniority rights/post selection

Plaintiff contends that defendant retaliated against her by failing to notify her of a post rotation roster circulation in February of 2009. Because she did not receive the roster, she was deprived of the ability to state her post preference, so upon her return to work in March of 2009 was relegated to work at whatever post was not selected by others. The post that was left, the segregation post, was undesirable to the plaintiff and to others.

The uncontested facts show the following. The corrections officers change posts annually. Before the annual rotation occurs, a post rotation roster is circulated, and employees are able to designate their preferences for the posts at which they desire to work. A formula is used to determine an employee's ranking for post rotation: points are awarded for the employee's length of service, positive performance reviews, and experience, and points are deducted for reprimands and other disciplinary actions.

Those with the most points get to select their post first. Plaintiff received at least one post rotation roster which was circulated when she was on FMLA leave, but did not receive the post rotation roster which was circulated in February of 2009, after plaintiff's FMLA leave had expired. When plaintiff returned to work in March of 2009, she was assigned to the segregation post which she would not have selected, and which some other employees consider to be the most difficult or least desirable post in the facility.

Defendant contends that precluding plaintiff from stating a post preference is not adverse action because post assignments do not change an officer's job duties, title, benefits, or salary. Dk. 105, p. 19-20. Defendant relies upon *Piercy*, 480 F.3d at 1203, but that case applied the standard of adverse action for discrimination cases, instead of the more lenient standard for retaliation cases, stated above. *See Piercy*, 480 F.3d at 1203, n.12. Plaintiff has presented testimony from other employees about the nature and undesirability of the segregation post to which plaintiff was assigned after her return to work, going beyond her mere subjective preference for another post. Accordingly, the court assumes possible adverse action.

Nonetheless, no causal connection can be found based on the facts of record. Plaintiff's EEOC complaint (the latter of her complaints of sexual harassment) was made on July 20, 2008. Defendant omitted plaintiff from the circulation of the post roster beginning on February 8, 2009. Here, as above, the intervening period of over six months is too long to independently support a finding of causation.

**Demotion**

Plaintiff contends that her demotion in August of 2009 was retaliatory. She returned to work in March, and on June 18, 2009, had a "30 day feedback" in her new

22

position as a sergeant in segregation. During plaintiff's probationary period, her supervisor, Mr. Pettis, expressed concerns about her poor work performance. He then conducted plaintiff's Performance Appraisal on July 29, 2009, rated her performance as "unsatisfactory," and stated that permanent status was not recommended. By that date, Officer Gamino had become plaintiff's supervisor, and on August 1, 2009, he gave plaintiff a scheduled review of her previous 30 days. His review expressed concerns about plaintiff's performance, but also stated that he had "utmost confidence that [plaintiff] will strive forward in [her] career here at TCF." Plaintiff appealed her "unsatisfactory" performance appraisal. After an evidentiary hearing, the appeals board upheld the rating of unsatisfactory and recommended demotion. Two days later, Warden Koerner made the final decision to demote plaintiff to COI from COII.

Plaintiff's unsatisfactory Performance Appraisal and her demotion thus occurred over a year after she filed her sexual harassment complaint, and are too remote in time to demonstrate any causal connection to it. Plaintiff did file a later EEOC charge of retaliation on May 9, 2009, but even considering that act to be protected conduct, plaintiff's demotion on August 13, 2009, is not sufficiently close in time to raise an inference of causation. *See Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (three-month period, standing alone, is insufficient to establish causation); *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004) (time period between two to three months not sufficient alone to establish causation).

For all the reasons stated above, the record fails to reveal a genuine issue of material fact regarding plaintiff's claims of sexual harassment and retaliation.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment

(Dk. 79) is granted, and that plaintiff's motion for partial summary judgment (Dk. 90) is denied.

Dated this 26th day of May, 2011.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge